NOT RECOMMENDED FOR PUBLICATION
File Name: 16a0125n.06

No. 15-5061

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Mar 02, 2016
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| ROCHELLE D. JOHNSON, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE WESTERN |
| PATRICK R. DONAHOE, Postmaster General, | ) | DISTRICT OF TENNESSEE |
| | ) | |
| Defendant-Appellee. | ) | |
| | ) | |

**BEFORE: MERRITT, MCKEAGUE, and WHITE, Circuit Judges.**

**HELENE N. WHITE, Circuit Judge.** Rochelle Johnson appeals the district court's grant of summary judgment to her former employer, the United States Postal Service (USPS), in this employment discrimination case alleging retaliation, sex discrimination, and hostile work environment under Title VII.[1] We **AFFIRM**.

**I.**

Johnson worked for USPS from 1979 until her retirement on July 31, 2009. From 2000 through July 22, 2006, Johnson worked at the Memphis Holiday City Station (HCS) as a mail-processing clerk. Pursuant to a reorganization initiated in November 2005 by then-Postmaster Ruby Bridgeforth, USPS informed HCS employees that it would transfer all mail carriers and a number of mail-processing clerks to the Airport Station (AMC). Johnson filed an EEO

---

[1] Johnson dismissed her race-discrimination claim, and does not appeal the district court's dismissal of her intentional infliction of emotional distress claim.

complaint in November 2006[2] challenging her transfer to AMC as an "involuntary reassignment." Also pertinent to this appeal are three other EEO complaints Johnson filed in 2008 and 2009.

In September 2012, Johnson and then co-plaintiff Sherry Shaw[3] filed a pro se complaint against USPS, Memphis Tennessee Area Local 96 (Local 96), and American Postal Workers Union, AFL-CIO (APWU). The district court granted the defendants' motion to sever the complaints. Johnson later retained counsel and voluntarily dismissed Local 96 and APWU from this action. The district court granted USPS's motion for summary judgment on Johnson's sex-discrimination, retaliation, and hostile-work-environment claims. This appeal followed.

## II.

We review de novo a district court's order granting summary judgment. *Rudisill v. Ford Motor Co.*, 709 F.3d 595, 600 (6th Cir. 2013). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Mitchell v. Fankhauser*, 375 F.3d 477, 479 (6th Cir. 2004). In determining whether the district court's grant of summary judgment was proper, "we must view all evidence in the light most favorable to the nonmoving party." *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 868 (6th Cir. 2007) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). "The mere existence of a scintilla of evidence to support plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).

---

[2] Johnson's 2006 EEO complaint alleged retaliation based on her earlier EEO complaints, the last of which she filed in 2004.

[3] Shaw's appeal is Docket No. 14-5678, opinion filed March 23, 2015.

USPS argues that this court should not consider 1) Johnson's affidavit because it contains conclusory statements, immaterial facts, and conclusions of law, and 2) Johnson's response to its statement of material facts because it is unresponsive and does not comply with Federal Rule of Civil Procedure 56(c). Consequently, USPS contends the court should accept its statement of material facts as uncontested.

Although Johnson's affidavit does contain numerous conclusory assertions and improper conclusions of law, it was "made on personal knowledge," and "set[s] out [some] facts that would be admissible in evidence," on matters on which Johnson is competent to testify. *See* Fed. R. Civ. P. 56(c)(4). "It is well settled that courts should disregard conclusions of law (or 'ultimate fact') found in affidavits." *F.R.C. Int'l, Inc. v. United States*, 278 F.3d 641, 643 (6th Cir. 2002) (quoting *A.L. Pickens Co., Inc. v. Youngstown Sheet & Tube Co.*, 650 F.2d 118, 121 (6th Cir. 1981)). However, a court "should use 'a scalpel, not a butcher knife,'" in striking inadmissible portions of an affidavit. *See Upshaw v. Ford Motor Co.*, 576 F.3d 576, 593 (6th Cir. 2009) (quoting *Giles v. Univ. of Toledo*, 241 F.R.D. 466, 469 (N.D. Ohio 2007)) (internal quotation marks omitted). Thus, we will consider the admissible portions of Johnson's affidavit.

As to USPS's statement of material facts, we accept its assertions only to the extent they are supported by record evidence. Rule 56(e) provides that "[i]f a party . . . fails to properly address another party's assertion of fact as required by Rule 56(c), the court *may*: . . . consider the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e) (emphasis added). However, a party asserting that there is no genuine dispute of material fact must still support its assertions with record evidence, Fed. R. Civ. P. 56(c), and USPS bears the burden of showing

that there are no genuine disputes of material fact, *Morales v. Am. Honda Motor Co.*, 71 F.3d 531, 535 (6th Cir. 1995).

## III.

### A. Retaliation

Title VII prohibits an employer from retaliating against an employee "because [s]he has opposed any practice made an unlawful employment practice by this subchapter, or because [s]he has made a charge, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e–3(a). A plaintiff can establish a retaliation claim either with direct or circumstantial evidence. *Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014). Because Johnson relies on circumstantial evidence, we analyze her retaliation claim using the *McDonnell Douglas* burden-shifting framework. *Id.* (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)).

Under this framework, Johnson must first establish a prima facie case of retaliation by showing 1) she engaged in protected activity, 2) USPS knew of her protected activity, 3) USPS thereafter took adverse employment action against her, and 4) there was a causal connection between her protected activity and the adverse employment action. *Yazdian v. ConMed Endoscopic Techs., Inc.*, 793 F.3d 634, 649 (6th Cir. 2015). A plaintiff establishes an adverse employment action under Title VII's retaliation provision by showing "that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006)) (internal quotation marks omitted); *see also Laster*, 746 F.3d at 719. Although this burden is less onerous than for demonstrating an

adverse action under Title VII's anti-discrimination provision, *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 595–96 (6th Cir. 2007), the standard for determining whether an action was adverse for the purposes of retaliation is an objective one, *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 69. "A mere inconvenience or an alteration of job responsibilities is not enough to constitute an adverse employment action." *Deleon v. Kalamazoo Cty. Rd. Comm'n*, 739 F.3d 914, 918 (6th Cir. 2014) (quoting *White v. Burlington N. & Santa Fe Ry. Co.*, 364 F.3d 789, 795 (6th Cir. 2004) (en banc)) (internal quotation marks omitted). "Title VII retaliation claims must be proved according to traditional principles of but-for causation," which "requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533 (2013).

If Johnson establishes a prima facie case, the burden of production shifts to USPS to articulate a legitimate, non-discriminatory reason for its actions. *Laster*, 746 F.3d at 730. "To meet this burden, [USPS] must clearly set forth, through the introduction of admissible evidence, the reasons for its decision." *Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 703 (6th Cir. 2007) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255 (1981)) (internal quotation marks omitted). USPS "need not *prove* a non-discriminatory reason for [its actions], but need merely *articulate* a valid rationale." *Hartsel v. Keys*, 87 F.3d 795, 800 (6th Cir. 1996) (citing *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 514 (1993)). If USPS meets that burden, the burden shifts back to Johnson to demonstrate that USPS's proffered explanation was a pretext for retaliation. *Laster*, 746 F.3d at 730.

### 1. 2006 Reorganization

Johnson alleges that USPS retaliated against her for her EEO activity by 1) involuntarily reassigning her to AMC, and 2) denying her in-section bidding and retreat rights under the

collective bargaining agreement (CBA). USPS does not dispute that Johnson engaged in protected activity or that her supervisors and the individuals involved in her transfer knew about that activity.[4]

Johnson's last EEO complaint before USPS transferred her to AMC in July 2006 was in November 2004. Johnson asserts that at various times around November 2005, supervisors and the local union President told the mail-processing clerks that if they did not volunteer to move to AMC as part of the reorganization, their jobs would be abolished and they would be moved to the station downtown. On June 20, 2006, Johnson bid on two open jobs at AMC. Johnson testified that she only bid on those positions because she had been told in 2005 that if she did not, her job would be abolished and she would be sent "downtown on the night shift."[5] (PID 2476.)

USPS informed Johnson on July 7, 2006, that employees with more seniority than she—Floyd Davis and Richard Bush—were assigned the jobs on which she had bid. This was consistent with USPS practice of awarding job bids based on seniority. At this time, USPS also awarded a position at AMC that Johnson had not bid on to HCS employee Sharon Hill.

According to USPS, as part of the reorganization, it required ten mail-processing clerks to move to AMC with the mail carriers; consequently, effective July 22, 2006, USPS planned to "excess"[6] the ten junior clerks from HCS and "[t]he seven (7) senior clerks were to be left [at

---

[4] Johnson filed thirteen formal EEO complaints against various USPS supervisors between 1981 and 2006.

[5] Despite USPS's contention that Johnson could have bid on positions remaining at HCS, the record suggests that those positions were not posted for bid at the time Johnson and other employees were encouraged to bid on positions.

[6] Under the Collective Bargaining Agreement, "excessing" occurs when an employee's job is eliminated and she is reassigned to a different section. (*See* PID 1553, 2063, 2565.)

HCS].”[7]  (*See* PID 2551.)  Because only Sales and Service Associate (SSA)[8] positions would remain at HCS, mail-processing clerks had to bid on SSA positions and complete training in order to remain there.  In the meantime, USPS temporarily assigned a number of junior clerks who were SSAs to HCS because some of the senior clerks were not then qualified as SSAs.

By letter dated July 19, 2006, Labor Relations Specialist Joseph Pegues notified Johnson that USPS would repost her mail-processing clerk duty assignment as an SSA duty assignment. The letter stated that if Johnson did not bid on the new duty assignment or another position, or was not a successful bidder, she would become an unassigned employee as of July 22, 2006. The letter also instructed Johnson to report to AMC effective July 22, 2006, because there were no jobs at HCS for which she qualified.  USPS reassigned Johnson to AMC effective July 22, 2006, but did not officially “excess” her from her position.  Wanda Jackson, another HCS mail-processing clerk, appears to have been reassigned to AMC under similar circumstances, i.e., after not having successfully bid on another position and not being officially excessed.

On July 30, 2006, Johnson sent a letter to HCS Manager Vanessa Barton, Union President Lee Price, AMC Manager Mary Ruffin, and Labor Relations Specialist George Whitten, purporting to exercise her right under the CBA to retreat to HCS.  There is no indication in the record that anyone responded to Johnson's letter.  Whitten testified that Johnson was not entitled to retreat rights because she had bid out of HCS and had not been excessed; only

---

[7] USPS uses the term “clerk” to refer to employees who had a variety of duty assignments, as distinct from the specific duty assignment of mail-processing clerk.

[8] SSAs worked the window, sold postage, and weighed items.  The SSA job description was different from the mail-processing-clerk job description.  Employees who performed both window and mail-processing duties were referred to as Sales Service Distribution Associates, or SSDAs.

excessed employees were entitled to retreat rights under the CBA. Pegues similarly testified that Johnson did not have retreat rights because she was not excessed.

On August 1, 2006, after Bush withdrew his bid, USPS awarded Johnson one of the positions at AMC for which she had bid on June 20, 2006. Johnson's new duty assignment, which resulted in her being assigned to a different section, was effective August 5, 2006. At the time USPS awarded Johnson this bid, she had been at AMC since July 22, 2006.

On August 7, 2006, USPS management offered four senior clerks—Doris Potter, Dexter Moragne, Dorothy Richardson, and Jackson—the opportunity to submit "in-section bids" on SSA duty assignments at HCS. In-section bidding is the process by which vacant duty assignments are posted for bidding to employees *within the same section* before being posted for bids outside the section. Richardson and Jackson both bid on the assignments. Johnson was present when Barton offered Jackson an in-section bid back to HCS and asked Barton if she could bid on one of the duty assignments, but Barton did not allow her to bid.

On August 15, 2006, ten junior employees who had been excessed from HCS received notice of their retreat rights, as well as a list of open SSA duty assignments at HCS on which they could bid. On August 29, 2006, Human Resources Specialist Janice McMahan sent a notice regarding "in-section bidding results," which indicated that one of the senior clerks— Richardson—and four of the junior clerks—Dorothy Prewitt, Carolyn Reeves, Linda Johnson, and Keiron Cochran—had been awarded positions at HCS.[9]

Johnson's base salary remained the same at AMC, but her start time changed by one hour and her days off changed from Sunday/Monday to Saturday/Sunday. Johnson stated that due to

---

[9] At some point after bidding, Jackson chose not to accept one of the SSA duty assignments at HCS.

the change in her start time, she lost one hour per day of "night differential" pay.[10]  Johnson testified that although the job duties were technically the same at both locations, female clerks at HCS were never required to load containers, but the supervisors at AMC wanted all clerks to perform those duties.

### a. Reassignment

Johnson cannot establish that her reassignment alone, even if involuntary, was caused by her prior EEO activity.[11]  USPS reassigned Johnson to AMC as part of a station-wide restructuring.  Although there are disputed facts regarding the exact contours of the July 2006 reorganization, it is clear that USPS moved all of the mail carriers as a group, and that as part of this reorganization, USPS also reassigned a number of mail-processing clerks from HCS to AMC.  Further, this decision was made at the postmaster level, by Ruby Bridgeforth, and not by any of Johnson's individual supervisors.  Thus, the undisputed facts show that Johnson's prior protected activity was not a but-for cause of her reassignment to AMC.

To the extent Johnson argues that her reassignment was retaliatory because USPS permitted other employees to remain at HCS, that argument is unavailing.  The record demonstrates that at least at the first step of the reorganization, USPS transferred all mail-processing clerks from HCS to AMC, and only employees who were then qualified as SSAs remained at HCS.  All of the junior employees Johnson lists who remained at HCS were SSAs.  To the extent Johnson argues she could have remained at HCS as an SSA because she was able to perform window duties, she conceded that she was not technically qualified as an SSA at the

---

[10] Clerks earned additional pay for hours worked after 6 PM.

[11] Johnson conceded "the move itself was not done in order to retaliate against [her]." (PID 2618.)  However, because she continues to argue on appeal that her reassignment was adverse, we address that claim here.

time. Thus, the record does not support that retaliation was the but-for cause of her reassignment.

### b. Denial of Retreat and In-Section Bidding Rights

USPS does not contest that denying an employee a retreat right to which she is entitled under a CBA could dissuade a reasonable employee from bringing a charge of discrimination. Rather, it contends that Johnson was not entitled to these rights under the CBA. However, Johnson has not shown that USPS's reliance on the CBA was pretextual, and even assuming Johnson was entitled to retreat or in-section bidding rights, the record contains no facts from which a jury could conclude that retaliation was the but-for cause of USPS denying her these rights.

"Although no one factor is dispositive in establishing a causal connection, evidence that defendant treated the plaintiff differently from similarly situated employees or that the adverse action was taken shortly after the plaintiff's exercise of protected rights is relevant to causation." *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000). Heightened scrutiny of an employee's work after she engages in protected activity can also imply causation. *See Hamilton v. Gen. Elec. Co.,* 556 F.3d 428, 436 (6th Cir. 2009). Although temporal proximity alone may, in some circumstances, support a causal inference, this circuit has generally required the protected activity and adverse action to occur "very close in time" in order to justify that inference. *See Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008). "[W]here some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality." *Id.* In general, "the more time that elapses between the protected activity and the adverse employment action, the more the plaintiff must supplement

his claim with 'other evidence of retaliatory conduct to establish causality.'" *Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 400 (6th Cir. 2010) (quoting *Mickey*, 516 F.3d at 524–25).

Johnson contends that she can demonstrate causation through close temporal proximity, and that actions taken by her supervisors between the time of her previous EEO activity and her reassignment and subsequent denial of retreat and in-section bidding rights bridge any temporal gap. Johnson also argues that USPS permitted similarly situated employees with no EEO activity to retreat to HCS.

Johnson's last protected activity prior to USPS's alleged adverse action was on December 7, 2004, over nineteen months before she was reassigned and denied retreat and in-section bidding rights in late July and August 2006. This timeframe "suggests, by itself, no causality at all." *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 274 (2001) (alleged adverse action taken twenty months after protected activity); *see also Nguyen,* 229 F.3d at 566–67 ("[P]revious cases that have permitted a prima facie case to be made based on the proximity of time have all been short periods of time, usually less than six months."); *Blosser v. AK Steel Corp.*, 520 F. App'x 359, 363–64 (6th Cir. 2013) (stating that 4.5-month gap "falls in the latter category [discussed in *Mickey v. Zeidler*], where a plaintiff must couple temporal proximity with other evidence to show causation"); *Cecil v. Louisville Water Co.*, 301 F. App'x 490, 502 (6th Cir. 2008) (finding a seventeen-month gap between protected activity and adverse action insufficient to infer causation). Johnson must therefore offer some other evidence of causation to establish a prima facie case of retaliation.

Johnson alleges that HCS manager Alvin Cash—against whom she had previously filed EEO complaints—blamed her for his not receiving a promotion, overly scrutinized her work in early 2006, and treated her differently from other clerks, further supporting a causal connection

between her prior EEO activity and USPS denying her retreat and in-section bidding rights. Heightened scrutiny of an employee's work between a protected activity and an adverse action can support a causal inference to the extent it suggests the employer scrutinized the employee's work in order to find some reason to take the alleged action. *See Hamilton*, 556 F.3d at 435–36. However, Cash's scrutiny of Johnson's work in early 2006 occurred over a year after her last complaint. More importantly, there is no evidence that Cash was involved in denying Johnson retreat or in-section bidding rights. In her EEO complaint, Johnson identified Pegues and Barton as the persons responsible for denying her these rights. Further, Cash was not one of the persons to whom Johnson sent a letter requesting to exercise her retreat rights in July 2006. An employer can be held liable for the actions of a supervisor "when the intermediate employee 'influences the unbiased decision-maker' to take an adverse action." *Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 353 (6th Cir. 2012) (quoting *Arendale v. City of Memphis*, 519 F.3d 587, 604 n.13 (6th Cir. 2008)). But there is no evidence to suggest that Cash influenced either Barton or Pegues to deny Johnson retreat or in-section bidding rights.

Johnson further argues that USPS treated her differently from other employees who had not filed EEO complaints. Specifically, she alleges that USPS permitted other employees junior to her—including Prewitt, Cochran, Richardson, and Jackson—to retreat to HCS. However, Richardson was not similarly situated to Johnson with respect to the reorganization because Richardson was an SSA, not a mail-processing clerk. As to the others, Johnson largely relies on her own statements to establish that they had not engaged in protected activity; the record shows only that one of these mail-processing clerks—Cochran—had no prior EEO activity. It is silent

as to Prewitt, and Jackson had engaged in protected activity at one point by serving as a witness for one of Johnson's earlier complaints. Further, Prewitt and Cochran had been "excessed."[12]

"In analyzing the facts in temporal proximity cases, we have always looked at the totality of the circumstances to determine whether an inference of retaliatory motive could be drawn." *Vereecke*, 609 F.3d at 401. Here, the totality of the circumstances does not support an inference that Johnson's 2004 EEO activity was the but-for cause of USPS denying her retreat or in-section bidding rights. Given the length of time between her last protected activity and this action, a reasonable jury could not infer a causal connection between the two based on this evidence alone.

Moreover, the record does not support that USPS's proffered reasons for denying Johnson retreat or in-section bidding rights were pretextual. USPS contends Johnson was not entitled to retreat rights because she was not excessed, and was not entitled to HCS in-section bidding rights because she had transferred out of HCS, to a new section.

The record demonstrates that with the exception of Jackson, all of the mail-processing clerks who were permitted to return to HCS had been excessed. To the extent Johnson contends she was "excessed" pursuant to the July 19 letter, she offers no record support. The letter states only that USPS would repost Johnson's duty assignment and that if she did not successfully bid, she would become an unassigned employee. There is no indication in the record that this was the same as being excessed. Further, the record shows that in order to repost Johnson's duty assignment, USPS needed to move her to a temporary assignment, which is consistent with

---

[12] Although Cochran denied receiving the letter informing him he was excessed and therefore entitled to retreat rights, the record shows he was excessed.

Johnson's initial transfer to AMC pursuant to the letter. The other two employees who bid out of HCS without being excessed—Davis and Hill—also did not receive retreat rights.[13]

Johnson concedes that under the CBA, she was not entitled to in-section bidding rights because HCS and AMC were different sections. She argues, however, that USPS cannot rely on this rationale because it allowed other employees at AMC to "in-section bid" on positions at HCS. We disagree. The employees who were permitted to in-section bid back to HCS, including Jackson, had not bid into new positions at AMC; thus, their duty assignments were technically still at HCS. Further, as noted above, the record shows that Jackson had participated in Johnson's earlier EEO activity as a witness, suggesting EEO activity had nothing to do with their different treatment. Thus, the record does not support an inference that USPS's reliance on the CBA was pretextual.

## 2. Denial of Overtime

At argument, Johnson contended that USPS also retaliated against her by denying her overtime. USPS responded that Johnson argued only that the denial of overtime was relevant to her hostile-work-environment and sex-discrimination claims. Although Johnson raised this claim before the district court, she did not argue in her brief on appeal that USPS retaliated against her by denying her overtime.[14] Thus, she has abandoned this claim. *See Enertech Elec.,*

---

[13] Although excessed employees did not lose their retreat rights if they bid into a new position *after* being excessed, no CBA provision in the record addresses employees who bid into a new position while temporarily assigned to another station.

[14] The retaliation section of Johnson's brief contains headings and accompanying arguments alleging the adverse actions of "Involuntary Transfer to Airport Station" and "Denial of Retreat Rights and In-Section Bidding." (Johnson Br. 38–45.) In arguing a causal connection between those actions and her protected activity, Johnson alleged a "complete temporal overlap" between her EEO activity and a number of USPS's actions, including the denial of overtime in 2007 and 2008. (*See id.* 47–54.) However, this section merely restates the facts and offers no argument about how the alleged actions were retaliatory.

*Inc. v. Mahoning Cty. Comm'rs*, 85 F.3d 257, 259 (6th Cir. 1996) ("[I]ssues not raised in appellant's opening brief will not be considered on appeal.").

## B. Sex Discrimination

Title VII prohibits an employer from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e–2(a). Because Johnson relies on circumstantial evidence of discrimination, we analyze her sex-discrimination claim using the *McDonnell Douglas* burden-shifting framework. *See Clay*, 501 F.3d at 703. Under this framework, Johnson must first establish a prima facie case of discrimination by showing 1) she was a member of a protected class, 2) she suffered an adverse employment action, 3) she was qualified for the position, and 4) a similarly situated person outside the protected class was treated more favorably than she. *Id.* "The fourth prong requires that [Johnson] show that the person treated more favorably was similarly situated to [her] in all relevant respects." *Id.*

If Johnson establishes a prima facie case, the burden of production shifts to USPS to articulate a legitimate, non-discriminatory reason for its actions. *See id.*; *Braithwaite v. Timken Co.*, 258 F.3d 488, 493 (6th Cir. 2001). If USPS meets that burden, the burden shifts back to Johnson to demonstrate that USPS's proffered explanation was a pretext for discrimination. *Clay*, 501 F.3d at 704.

Johnson argues that USPS discriminated against her based on her sex when it denied her off-day overtime on various Saturdays beginning in 2008,[15] and instead assigned those overtime shifts to Moragne, a male mail-processing clerk. USPS argues that it had a legitimate, non-

---

[15] Although Johnson filed complaints regarding the denial of holiday, Saturday, and begin-tour overtime beginning in September 2007, she only alleges that the denial of Saturday overtime constitutes sex discrimination.

discriminatory reason to deny Johnson overtime on the dates in question—that is, she could not perform the work required during overtime hours due to her work restrictions.[16]

Following an on-the-job injury sustained in April 2007, Johnson was unable to perform certain tasks generally required of mail-processing clerks, such as lifting up to seventy pounds and reaching above her shoulder for an extended period. Although Johnson's physical restrictions varied over time, from July 2007 until her retirement in 2009, Johnson could not lift more than fifteen pounds, and was occasionally restricted to lifting only five to ten pounds; she could push and pull, and reach above her head for four hours per day from December 2007 to June 10, 2008, but, from June 2008 until her retirement she was restricted to zero hours per day of pushing and pulling and zero to one hour per day of reaching above her head.[17] From June 10, 2008 until March 12, 2009, Johnson's physician recommended limiting her mail-sorting activities to 2.5 hours per day and further limited many of the other tasks she could perform. The restriction on sorting mail was changed to 3.5 hours per day in March 2009, but was not lifted

---

[16] At oral argument, Johnson stated she had been denied overtime prior to her injury in 2007. Her affidavit and EEO complaints indicate that in 2002, Cash denied her holiday overtime while she was at HCS. However, that denial is not related to the claims in the instant case. Johnson's EEO complaints and later pleadings all allege that overtime denial during the relevant period began with the denial of Labor Day holiday overtime in September 2007, which was after her injury.

[17] Johnson contended at oral argument that she was capable of lifting up to seventy pounds, that her condition had improved, and that she went to a doctor to have her restrictions changed. However, this claim is unsupported by the record. Johnson admitted in her deposition that at no point from July 2007 until her retirement could she lift more than twenty pounds. Further, during her deposition in 2013, Johnson stated that she was still limited by her injury, specifically that she could not mop, sweep, wash her hair, or lift more than ten to fifteen pounds. She also stated that as of 2013, her doctor told her she was not likely to improve. Moreover, Johnson's claim at oral argument that USPS required her to do work outside her limitations during her regular hours is belied by her admission that USPS never asked her to work outside her limitations. (Johnson Dep., PID 2487 ("[T]o the best of my knowledge and belief, I was never told to work outside my limitations."); Johnson Resp. SMF, PID 2649 ("Plaintiff was never asked to work outside of her limitations. . . . Admitted.").)

until May 2009, shortly before Johnson retired. Johnson testified that following her injury, she occasionally needed help from co-workers to perform her regular job duties.

USPS policy dictated that overtime be rotated among employees by seniority. Although limited-duty employees were not disqualified from working overtime, an employee could be skipped in the overtime rotation if she had physical limitations that prevented her from performing the necessary work. A neutral company policy is a legitimate non-discriminatory reason to take an employment action. *Wierengo v. Akal Sec., Inc.*, 580 F. App'x 364, 375 (6th Cir. 2014); *see also Hollins v. Atl. Co.*, 188 F.3d 652, 661 (6th Cir. 1999).

The burden thus shifts back to Johnson to demonstrate that this proffered reason was a pretext for retaliation, *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009), that is, that "the proffered reason (1) has no basis in fact, (2) did not actually motivate [USPS's] challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000). Regardless which theory Johnson advances, she "retains the ultimate burden of producing 'sufficient evidence from which the jury could reasonably reject [USPS's] explanation and infer that [USPS] intentionally discriminated against [her].'" *Johnson v. Kroger Co.*, 319 F.3d 858, 866 (6th Cir. 2003) (quoting *Braithwaite*, 258 F.3d at 493).

Johnson attacks the veracity of USPS's reason for denying her overtime, arguing that the work required on Saturdays did not exceed her physical limitations.[18] This first method of

---

[18] Johnson also contended at oral argument that USPS's reason was pretextual because she was exceeding her restrictions during the week, so she could have exceeded them on weekends. However, she did not make that argument in her appellate brief or her summary judgment brief to the district court. Moreover, despite Johnson's protestations to the contrary, the record demonstrates that she had physical restrictions from July 2007 until her retirement in 2009. Although she stated in her summary judgment brief and at argument that she could perform the essential functions of her job, she also admitted that she was able to work *within her limitations* and that she sometimes asked other employees for help. To the extent Johnson argues

showing pretext is "essentially an attack on the credibility of the employer's proffered reason . . . [and] consists of showing that the employer did not actually have cause to take adverse action against the employee based on its proffered reason." *Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 285 (6th Cir. 2012) (quoting *Joostberns v. United Parcel Servs., Inc.*, 166 F. App'x 783, 791 (6th Cir. 2006)). Johnson supports this argument with Moragne's clock rings, which she contends show Moragne did only light work on two Saturdays, and with affidavits from her husband, Norris Johnson, and her former co-plaintiff Shaw.

Johnson contends that Moragne's clock rings from July 1 and October 2, 2008, show that he was not unloading and loading trucks, setting up the parcel area, or distributing carrier-routed mail; rather, he was working parcels and the accountable cage. However, this does not suggest he was performing only light work on those dates. Johnson's supervisor Ave Williford stated in her EEO affidavit that parcels could weigh up to seventy pounds and that working accountables included pushing a cart that weighed up to seventy pounds. Johnson has not challenged these claims. Johnson also contends that USPS's proffered reason is pretextual because mail-processing clerks were never required to load or unload trucks, belying Williford's assertion that that was one of the off-day overtime tasks Johnson was unable to perform. However, even assuming mail-processing clerks were not required to load or unload trucks, there were numerous other tasks generally required of mail-processing clerks that Johnson was unable to perform due to her injury, such as lifting parcels or pushing a cart weighing up to seventy pounds. Thus, this evidence does not suggest USPS's proffered reason is false.

---

that she was being required to exceed her restrictions during the week, that claim is belied by her admissions that USPS never asked her to work outside her limitations.

Shaw and Norris Johnson's affidavits state that they worked on Saturdays and observed Moragne's work, and that he did not perform strenuous work, load trucks, or lift heavy objects or parcels. However, Norris Johnson acknowledged that he was not present at the station all day on Saturdays because he was a mail carrier. Moreover, that "[a]ll job tasks performed by Moragne, as seen by [Shaw], were things Rochelle Johnson could have performed," does not show that the proffered reason was pretext. (*See* PID 1284.) Johnson had numerous physical restrictions from July 2007 through May 2009, including restrictions on the number of hours she could push/pull, reach above her head, and sort mail. Shaw's affidavit addresses neither these stringent restrictions nor the dates on which Moragne was scheduled for overtime instead of Johnson.

Johnson also fails to demonstrate pretext through the second method, under which a plaintiff "attempts to indict the credibility of [the] employer's explanation by showing circumstances which tend to prove that an illegal motivation was *more* likely than that offered." *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 546 (6th Cir. 2008) (quoting *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994), *abrogated on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009)). Although USPS denied Johnson full-day overtime on Saturdays and holidays, and begin-tour overtime on various days, only the Saturday overtime was given exclusively to a man; the record suggests the other overtime shifts were given to both men and women, undermining any suggestion that USPS's actions were motivated by gender.[19]

Thus, Johnson has not demonstrated that USPS's proffered reason for denying her overtime was pretextual.

---

[19] Johnson does not advance arguments under the third mode of demonstrating pretext, which ordinarily consists of showing that the employer did not treat similarly situated employees adversely. *See Manzer*, 29 F.3d at 1084.

### C. Hostile Work Environment

Finally, Johnson argues that USPS created a hostile work environment in retaliation for her EEO activity, which resulted in her being constructively discharged.

Under Title VII, a plaintiff is subjected to a hostile work environment where "the workplace is permeated with discriminatory intimidation, ridicule or insult sufficiently severe or pervasive to alter the conditions of employment." *Waldo v. Consumers Energy Co.*, 726 F.3d 802, 813 (6th Cir. 2013) (quoting *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 333 (6th Cir. 2008), and *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65–67 (1986)) (internal quotation marks omitted). In order to succeed on a Title VII hostile-work-environment claim, a plaintiff must demonstrate that:

> (1) she belonged to a protected group, (2) she was subject to unwelcome harassment, (3) the harassment was based on [her protected status], (4) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment, and (5) the defendant knew or should have known about the harassment and failed to act.

*Williams v. CSX Transp. Co.*, 643 F.3d 502, 511 (6th Cir. 2011). In deciding whether harassment is "sufficiently severe or pervasive," we consider factors including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 512 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)).

Johnson offers the following facts in support of her hostile work environment claim: 1) management officials told her on several occasions that she would be "sent downtown" to work the night shift; 2) Whitten stated in 2006, "[s]he better be glad we didn't send her black ass downtown;" 3) in 2008, when a gate at AMC was broken, Johnson was forced to enter the building through the lobby and wait for other clerks to let her in; 4) Johnson's co-workers

belittled her due to her injury; 5) USPS denied Johnson overtime on numerous occasions in 2007 and 2008; 6) USPS forced Johnson to sign Modified Duty Offers; 7) manager Bertrand Tate told her EEO complaints were taken personally; 8) manager Herman Albright, against whom Johnson had filed an EEO complaint in 2004, came to her home uninvited to speak to her husband; and 9) USPS seized her medical records without permission.[20]

Even when considered together, these incidents are not severe or pervasive enough to constitute a hostile work environment. Whitten's comment and Johnson's co-workers comments belittling her injury—though offensive—do not appear to have been pervasive. "[S]imple teasing, . . . offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 515 (6th Cir. 2009) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)) (alterations in original) (internal quotation marks omitted). Further, although Johnson contends that numerous supervisors threatened to send her downtown to work the night shift, her own EEO complaint states that all clerks were told that at a group meeting in November 2005. As for her badge not working, although Johnson alleged in her Response to USPS's statement of material facts that other employees did not have this issue, she admitted in her deposition that she did not know how other employees entered the building because they had different start times. Further, although Johnson alleges that Albright showed up at her home uninvited, she offers no indication of the nature of this conversation, stating only that Albright— a USPS supervisor—came to speak with her husband, who was also a USPS employee.

---

[20] Johnson makes a number of additional allegations regarding incidents in 2009 that are either conclusory, not in admissible form in the record, or both. Further, none of these allegations were mentioned in Johnson's Response to USPS's statement of material facts or brief to the district court.

Moreover, the seizure of Johnson's medical records occurred after she retired, and thus could not have contributed to a hostile work environment while she was employed.

Johnson implies in her brief that the Modified Duty Offers were retaliatory. However, these offers only noted the number of hours Johnson could perform certain tasks due to her injury—they did not change her salary, and in only one instance did a Modified Duty Offer change Johnson's start time by one and a half hours. Johnson made no arguments either in the district court or on appeal as to why or how these offers were retaliatory. She contended in her Response to USPS's statement of material facts that USPS did not give her a Modified Duty Offer until March 6, 2008, despite her injury occurring in April 2007, and argued that the Modified Duty Offer should have triggered an accommodation process. To the extent Johnson contends that not giving her a Modified Duty Offer until March 6, 2008, shows a failure to accommodate her limitations, that is belied by her admissions that USPS never asked her to work outside her limitations. Moreover, to the extent Johnson contends the offers were used to justify denying her overtime, that is unsupported by the record. USPS has never relied on the Modified Duty Offers to justify denying Johnson overtime; rather, it has relied on her Duty Status Reports showing her physical restrictions. Moreover, Johnson was denied overtime prior to signing the first Modified Duty Offer, and was assigned overtime on at least two dates afterward.

Johnson asserts that she retired in 2009 because she could no longer stand the hostile work environment. To state a claim for constructive discharge based on a hostile work environment, a plaintiff "must show working conditions so intolerable that a reasonable person would have felt compelled to resign." *Pennsylvania State Police v. Suders*, 542 U.S. 129, 147 (2004). Thus, Johnson must present evidence showing 1) that USPS "deliberately create[d] intolerable working conditions, as perceived by a reasonable person,' and 2) [USPS] did so 'with

the intention of forcing [her] to quit . . . .'" *Logan v. Denny's, Inc.*, 259 F.3d 558, 568–69 (6th

Cir. 2001) (quoting *Moore v. KUKA Welding Sys.*, 171 F.3d 1073, 1080 (6th Cir. 1999)).

Adopting the Fifth Circuit's approach, this court looks to the following factors to evaluate

a constructive-discharge claim:

> (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement or continued employment on terms less favorable than the employee's former status.

*Id.* at 569 (quoting *Brown v. Bunge Corp.*, 207 F.3d 776, 782 (5th Cir. 2000)).

The conditions Johnson alleges do not meet this standard.

## IV.

For these reasons, we **AFFIRM.**